C/M

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------- X
TREVOR ANDERSON,

                         Petitioner,

              - against -

WILLIAM LEE, Superintendent of Eastern New
York Correctional Facility,

                       Respondent.
---------------------------------------------------------- X

**MEMORANDUM DECISION AND ORDER**

19-cv-4488 (BMC)

**COGAN**, District Judge.

      In a decision and order dated April 6, 2020, familiarity with which is assumed, I denied two of the three claims in petitioner's request for habeas corpus relief under 28 U.S.C. § 2254(d).[1] However, I deferred ruling on petitioner's third claim – a multi-prong attack on the effectiveness of his trial counsel. The basis for deferring ruling on this third claim was my conclusion that the state courts had exorbitantly applied a procedural bar to block consideration of the merits of most of that claim, and that I therefore had to consider the claim *de novo*. Because the parties had not addressed that claim under a *de novo* standard of review, I requested, and have received from both sides, additional briefing of the claim under that standard.

      The test for ineffective assistance of trial counsel claims is too well-established to require much discussion. Briefly, to prove ineffective assistance of counsel, petitioner must meet the two-prong test set forth in Strickland v. Washington, 466 U.S. 668 (1984). The first prong requires him to show that counsel's performance fell below "an objective standard of

---

[1] Anderson v. Lee, __ F. Supp. 3d __, 2020 WL 1682605 (E.D.N.Y. April 7, 2020).

reasonableness" under "prevailing professional norms." Id. at 688. I must apply a "strong presumption of competence" and "affirmatively entertain the range of possible reasons [petitioner's] counsel may have had for proceeding as they did." Cullen v. Pinholster, 563 U.S. 170, 196 (2011) (citation and internal quotation marks omitted). The second prong requires petitioner to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 669. "The likelihood of a different result must be substantial, not just conceivable." Harrington v. Richter, 562 U.S. 86, 112 (2011).

None of the acts or omissions that petitioner contends deprived him of effective assistance of counsel entitle him to relief. He merely second guesses his trial counsel's strategy calls or the jury's determination. His arguments are disposed of as follows.

## I.     Failing to call a medical expert

Most vehemently stressed by petitioner is his claim that his counsel was constitutionally ineffective for failing to hire a medical expert to show that petitioner shot the victim, Erick Brown-Gordon, only two times, not four times.[2] Petitioner contends that if a medical expert would have opined that petitioner shot Brown-Gordon only twice, then the jury would have been unable to find that petitioner intended to kill Brown-Gordon, or, alternatively, the evidence would have raised a reasonable doubt as to whether someone else had shot Brown-Gordon. The § 440 court rejected this argument on the merits for numerous reasons, and I think there are even more.[3]

---

[2] Brown-Gordon had four bullet wounds, but the record was not entirely clear as to whether two of them were exit wounds. For reasons described below, it is clear that petitioner fired at least three shots.

[3] I already addressed this two shots v. four shots theory in my prior decision, albeit in a different context. Petitioner alleged a sentencing error because, petitioner claimed, the sentencing court had assumed four shots, not two shots,

2

First, as to petitioner's intent at the time of the shooting, it is entirely speculative to assume the jury would have found that two shots versus four shots made the difference as to whether petitioner intended to kill Brown-Gordon, especially since in either scenario, at least one shot hit Brown-Gordon when his back was turned, and under no scenario did Brown-Gordon attack petitioner. I highly doubt that the decision of a reasonable jury that petitioner intended to kill Brown-Gordon would hinge on whether he shot him twice two, three, or four times. Shooting someone twice from six feet away with a .45 caliber firearm is more than sufficient to demonstrate intent to kill; indeed, shooting someone once is sufficient. See, e.g., People v. Cabassa, 79 N.Y.2d 722, 728, 586 N.Y.S.2d 234, 236 (1992); People v. Galarza, 127 A.D.3d 407, 408, 4 N.Y.S.3d 500 (1st Dept't 2015); People v. Blue, 55 A.D.3d 391, 865 N.Y.S.2d 97 (1st Dep't 2008). The evidence was overwhelming that regardless of how many shots hit Brown-Gordon, the gun was fired towards the victim at least three times (the police found three or four shell casings), which is plenty of indicia of intent.

As to identification, I do not see how the number of bullet wounds would bear one way or the other on petitioner's identity. In any event, there was extensive evidence that petitioner was the shooter. Petitioner makes much of the fact that no witness testified to seeing the gun in his hand at the time the shots rang out. But the lack of direct evidence on seeing the shots is insignificant in light of the abundance of circumstantial evidence showing that petitioner was the shooter.

---

and therefore given him a more severe sentence. Applying the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254 *et seq.*, standard of review, I rejected this claim because the reviewing court found that the sentencing court had made no such assumption. My prior holding, however, is not controlling as to petitioner's ineffective assistance of counsel claim, as it now appears in a different context under a different standard of review.

3

Specifically, the woman in the middle of the triangle, petitioner's former girlfriend Diana Perez, testified that after she confronted petitioner in the street with Brown-Gordon and after they started walking away him (Perez in front and Brown-Gordon in back), she heard about six or seven shots ring out, and Brown-Gordon fell. After she heard the shots, she began running away. She further testified that petitioner then caught up with her and forced her into a livery cab which took her home, getting in with her and, at one point, gesturing to his right side which made her think he might shoot her. She also testified that when she exited the car, petitioner told her "don't tell anyone." In addition, three witnesses testified that petitioner was the only person on the street at the time of the shooting besides Brown-Gordon. Before he passed out, Brown-Gordon identified petitioner to his father, William Gordon ("William") as the shooter. And cell phone records showed several calls between petitioner and Perez up to one minute before the shooting.

Brown-Gordon also testified that defendant had approached him, they exchanged words, and from a distance of six to seven feet away, he saw petitioner move his arm, and then gunshots rang out. Brown-Gordon further testified that when he turned to flee, he was hit by another bullet in the back, and that when William ran out to the street to aid him, he told his father it was petitioner who shot him. There was thus abundant evidence by which the jury could find that petitioner was the shooter, even in the absence of a witness observing a gun in petitioner's hand.

Secondly, it seems clear that both of petitioner's prior counsel did in fact consult with a medical expert but determined not to use him. Petitioner had two trials, the first of which ended in a hung jury.[4] In each trial, he was represented by an attorney, albeit a different attorney, from the Legal Aid Society. As shown below, the colloquy at petitioner's sentencing after the second

---

[4] The record indicates that the first jury hung 11-1 in favor of conviction with one juror refusing to deliberate.

trial, when the issue of the number of shots came up, compels the conclusion that petitioner's first legal aid lawyer had indeed consulted a medical expert on this issue and that the second lawyer had further consultations with that same expert.

In contending at sentencing that the record showed less than four bullet wounds to the victim, and that the prosecutor had committed misconduct by alleging four bullet wounds to the victim in his closing argument, defense counsel stated, "I did send the medical records, with the corresponding testimony of the complaining witness in this case, to a doctor who has been used over the years by the Legal Aid Society." He further disclosed that this was the same medical expert with which his colleague from the first trial had consulted. Counsel argued that his discussions with the medical expert led him to believe that petitioner had shot Brown-Gordon less than four times, and that the evidence of how many times was inconsistent. Although the sentencing court (by the same judge who had presided over the second trial) did not make a definitive finding, the court was clear that whether it was two, three or four shots was immaterial: "I would say it is more likely that were at least three, and one of them is probably from the back. And I really didn't intend to … insert myself, beyond raising an issue that I thought could answered by counsel on either side."[5]

We do not know exactly what the medical expert opined to petitioner's first and second trial counsel, although it seems likely he was prepared to state his opinion that as to the number of shots, it may have been some number less than four and perhaps as few as two. But in any event, it is clear that separate counsel at both trials made the same determination not to call the

---

[5] Respondent also contends that petitioner failed to submit a medical expert affidavit in his post-judgment proceedings to support his theory. That is true, but I am not giving that much weight, as obtaining a medical expert in the context of § 440 proceeding would have been difficult if not impossible. More probative to me is the fact that petitioner could have had access to both his attorneys' files before he filed his post-judgment proceedings but made no reference to his attorneys' consultations with the medical expert.

5

expert. Putting aside the inference that the medical expert was not called because he might have actually hurt petitioner's case, the decision not to call him was a strategic determination that counsel was entitled to make. See generally United States v. Smith, 198 F.3d 377, 386 (2d Cir. 1999).

Petitioner's trial counsel had a Hobson's choice – both the identification defense and the lack of intent defense were weak. Yet he could not choose both, for it would not have been a credible argument to the jury to assert that "someone else shot Brown-Gordon but if you find that my client did it, then you should also find that he didn't intend to kill him." Counsel's choice to go with the identification defense by attempting to discredit the witnesses against petitioner was not constitutionally defective. See generally Daly v. Lee, No. 11-cv-3030, 2014 WL 1349076, a *17 (E.D.N.Y. April 4, 2014) ("The decision to choose one consistent defense is the kind of strategic decision entrusted to counsel.").

In sum, whether I provide AEDPA deference to the § 440 court's rejection of this argument, or whether, for reasons stated in my prior decision, I review it *de novo* as part of the entirety of petitioner's ineffective assistance of trial counsel claim, petitioner has demonstrated neither that counsel was objectively unreasonable in determining not to call the medical expert nor that he was prejudiced by that decision.

## II.    Prior Bad Act Evidence

Before the grand jury, the prosecutor called Perez who testified, among other things, that she had seen petitioner with handguns on an occasion prior to the night Brown-Gordon was shot. In a pretrial hearing, the prosecutor sought a ruling under People v. Molineux, 168 N.Y. 264, 61 N.E. 286 (1901), contending that Perez's statement was not being offered to show propensity, but that petitioner's familiarity with handguns supported the prosecutor's theory that petitioner

6

intended to kill Brown-Gordon. The hearing court held (ironically) that in light of the fact that multiple shots were fired, "intent is not an issue," and therefore denied the prosecutor's application.

Seizing on this ruling, petitioner contends that it was improper for the prosecutor to have presented that evidence to the grand jury and that his counsel was ineffective for not seeking to dismiss the indictment on that ground once the hearing court precluded Perez's testimony. This argument fails for at least two reasons.

First, there is no rule under New York law that decisions made by the prosecutor regarding what evidence to place before a grand jury must precisely parallel the trial court's subsequent discretionary evidentiary rulings before or at trial, and that if they don't, the indictment is subject to dismissal. Although, unlike in federal practice, the rules of evidence generally apply to New York grand jury proceedings, see N.Y. C.P.L. § 190.30(1), only if the prosecutor offers plainly inadmissible evidence, knowingly perjured testimony, or otherwise acts in bad faith before the grand jury, is the indictment vulnerable. See Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994) (citing Colon v. City of New York, 60 N.Y.2d 78, 468 N.Y.S.2d 453 (1983)).

That is a particularly material point in this case because petitioner got a very generous exercise of discretion when the hearing judge denied the prosecutor's motion to allow Perez's prior bad act evidence (i.e., the possession of guns on one occasion) at his second trial. In fact, the prosecutor in petitioner's first case had obtained the opposite ruling, and Perez was permitted to repeat the testimony she had given before the grand jury that she had observed petitioner with two guns on an occasion prior to the Brown-Gordon shooting.

7

Moreover, the ruling allowing the evidence in the first trial was in accord with all of the recent Appellate Division cases that have decided this precise issue. In People v. Nunes, 168 A.D.3d 1187, 90 N.Y.S.3d 694 (3rd Dep't 2019), for example, the defendant was convicted of murder, attempted robbery, and criminal possession of a weapon. The trial court admitted testimony from the defendant's girlfriend that on a prior occasion, she had observed the defendant with a handgun. The Appellate Division upheld the conviction, holding that:

> The evidence regarding defendant's prior possession of a handgun was inextricably interwoven with the charged crimes and tended to show that defendant had access to the weapon that was used in the shooting, and we discern no error in Supreme Court's conclusion that its probative value outweighed any prejudicial effect.

Id. at 1192, 90 N.Y.S.3d at 700-01.

Similarly, in People v. Humphrey, 109 A.D.3d 1173, 971 N.Y.S.2d 631 (4th Dep't 2013), the defendant was convicted of manslaughter and assault. During trial, the trial court admitted photographs of the defendant holding a rifle on a prior occasion. The Appellate Division rejected the argument that this was error, holding that the photographs were "not evidence of an uncharged crime absent further proof that his possession of that item was illegal. Mere speculation that a jury may discern something sinister about a defendant's behavior does not render such behavior an uncharged crime." Id. at 1174, 971 N.Y.S.2d at 633 (*colatus*).

In short, petitioner cannot bootstrap a generous trial court discretionary ruling into a claim that his indictment was unlawful. The prosecutor's offer of this evidence to the grand jury was clearly in good faith, with a reasonable expectation that the evidence would be admissible at

trial.[6] His counsel was thus not ineffective for failing to raise an issue that would have been resolved against him.

The second reason why petitioner's argument fails is that even when a prosecutor offers improper evidence or acts in bad faith with regard to putting evidence before the grand jury, the indictment usually will not be deemed infirm under New York law. The submission of some inadmissible or improper evidence during the course of a grand jury proceeding is fatal only when the remaining legal evidence is insufficient to sustain the indictment. People v. Pelchat, 62 N.Y.2d 97, 105, 476 N.Y.S.2d 79, 83 (1984); People v. Chiarenza, 185 A.D.2d 679, 587 N.Y.S.2d 888 (4th Dep't 1992).

Even excluding Perez's testimony about the prior handgun possession, there was still plenty of evidence demonstrating a *prima facie* case that petitioner committed the crime. Brown-Gordon and Perez both testified that petitioner was the shooter. Specifically, Brown-Gordon testified that, after passing petitioner in front of his house and turning back to exchange words with him, he saw petitioner with both hands in his pocket. His next recollection was hearing gun fire and getting shot multiple times. Wounded but still conscious, Brown-Gordon testified that he then observed petitioner "run up the block and turn the corner[.]" A week later, he picked petitioner out of a lineup at the local precinct.

Brown-Gordon's testimony was largely corroborated by Perez. She testified that petitioner was her ex-boyfriend and that she had called petitioner because she had just been in an argument with Brown-Gordon. She told the grand jury that after Brown-Gordon and she stepped out of the former's house, she saw petitioner begin to cross the street and walk towards them. At

---

[6] In fact, the only reason this question was asked of Perez was because a member of the grand jury posed the question.

9

this point, she turned away and heard multiple gunshots. After she had turned the corner, petitioner caught up with her and shoved her into a cab. In the cab, petitioner warned Perez not to say anything. Petitioner repeats his argument that neither Brown-Gordon nor Perez actually saw him holding the handgun, but as shown above, that conclusion is inescapable based on the inferences that could be drawn from their testimony. Gilding a lily that is already in full bloom does not invalidate an indictment. See Hernandez v. Kuhlmann, 14 F. App'x 90, 92 (2d Cir. 2001).

Because a motion by counsel to dismiss the indictment based on the prior gun episode would certainly have failed, petitioner's trial counsel was not objectively unreasonable in determining not to file a futile motion. For the same reason, petitioner was not prejudiced by the absence of a motion to dismiss.

### III.     Pretrial Hearing/Reopening Errors

Prior to petitioner's trial, his counsel moved to suppress evidence that Perez picked petitioner out of photo array and that Brown-Gordon picked him out of a photo array and lineup. The hearing court denied petitioner's motion, finding that the identification evidence met constitutional standards.

It is not entirely clear as to the errors and omissions petitioner contends his trial counsel made with respect to the pretrial hearings. I see three possibilities, none of which have any merit.

First, petitioner may be arguing that there was insufficient probable cause to arrest and prosecute him, and that his attorney erred in not seeking to dismiss the indictment on that basis. There was certainly probable cause to arrest him based on Perez and Brown-Gordon's

10

identification of him and statements to the police, to which a police officer with firsthand knowledge testified at the suppression hearing. And having reviewed the grand jury testimony, there was even more probable cause to prosecute him. If this is petitioner's argument, it is not clear what he thinks his counsel could or should have done.

More likely, petitioner is reprising his argument that since Perez, Brown-Gordon, and William testified at trial that they did not see a gun in petitioner's hand or a muzzle flash, their identifications of him as the shooter were inadmissible and resulted in an illegal arrest, and that his attorney unreasonably failed to seek to reopen the suppression hearing when they so testified at trial. As illustrated above, petitioner has simply ignored the extensive circumstantial evidence pointing to him as the shooter and enabling the jury to reach that conclusion.

The final argument petitioner advances is that the photo array identifications by Perez and Brown-Gordon, and probably his arrest and prosecution, should have been suppressed because his photo in the array was "illegally obtained" from a prior, unrelated arrest, the records of which had been sealed under N.Y. C.P.L. § 160.50, and that his counsel was ineffective for not seeking that relief. This argument fails because (1) there is nothing in the record to suggest that the earlier photograph was, in fact, the one that had been sealed; (2) there is nothing in the record to suggest that petitioner told his trial counsel that his photograph was from the prior arrest; and (3) the New York Court of Appeals has held that suppression is not an available remedy for a violation of C.P.L. § 160.50. See People v. Patterson, 78 N.Y.2d 711, 579 N.Y.S.2d 617 (1991).

In sum, if petitioner is contending that his counsel should have either challenged his arrest or prosecution, or the witnesses's identification of him because of their testimony during trial, there was nothing objectively unreasonable in not making motions that were virtually

11

certain to lose. For the same reason, petitioner was not prejudiced by his counsel's decision not to make such a motion.

### IV. Failing to object to alleged <u>Sandoval</u> ruling

Before petitioner's second trial, the prosecutor obtained a ruling pursuant to <u>People v. Sandoval</u>, 34 N.Y.2d 371, 357 N.Y.S.2d 849 (1974), that if petitioner chose to testify, he could be questioned about whether he had been in possession of guns on a prior occasion, as Perez had described in her grand jury testimony.[7] As discussed above, petitioner's trial counsel had obtained a pretrial ruling successfully blocking the prosecutor from questioning Perez at the second trial on that incident, but the trial court held that the grand jury testimony could form a good faith basis for questioning petitioner on the incident if he testified.

The Appellate Division found that, although the trial court's ruling was incorrect, the error was harmless and did not deprive petitioner of a fair trial. <u>People v. Anderson</u>, 130 A.D.3d 1055, 1056, 15 N.Y.S.3d 103, 105 (2nd Dep't 2015). The New York Court of Appeals held, in contrast, that the error was unpreserved because petitioner had failed to object to the <u>Sandoval</u> ruling. <u>People v. Anderson</u>, 29 N.Y.3d 69, 74, 52 N.Y.S.3d 256, 259 (2017). Petitioner argued in his § 440 motion, and argues here, that his counsel was ineffective for failing to preserve the error.

I reject petitioner's claim that counsel was ineffective for failing to preserve the purported error for a number of reasons. First, I am not at all convinced that the Appellate Division correctly ruled that the trial court's <u>Sandoval</u> ruling was error. If petitioner took the

---

[7] I reject respondent's argument that the trial court made no ruling on this issue. It reserved ruling on the <u>Sandoval</u> issue about whether petitioner's disciplinary history as a former Georgia police officer could be used to impeach petitioner, but it clearly ruled that if petitioner testified, he could be questioned about the gun possession incident that Perez had described.

12

stand in a case where his intent or lack of intent to kill was an issue, his prior experience with handguns seems fair game to me for the same reasons that I think Perez should have been permitted to testify to the prior incident. See Nunes, 168 A.D.3d 1187, 90 N.Y.S.3d 694; Humphrey, 109 A.D.3d 1173, 971 N.Y.S.2d 63. Nor do I think it would be unduly prejudicial to cross-examine petitioner on that incident, since the mere possession of the guns on one occasion, without more, is not the same as evidence that he committed a crime. See id. at 1174, 971 N.Y.S.2d at 633.

But even if the failure to preserve was error, the Appellate Division's alternative ruling – that the error was harmless and did not deprive petitioner of a fair trial – is at least roughly co-extensive with Strickland's prejudice prong. See Alleyne v. Racette, No. 15-cv-1915, 2020 WL 2797521, at *14 (E.D.N.Y. May 28, 2020); Guerrero v. United States, No. 15-cv-7282, 07-cr-248, 2017 WL 1435743, at *8 (S.D.N.Y. April 20, 2017); Barry v. United States, No. 14-cv-5898, 2015 WL 3795866, at *2 (E.D.N.Y. June 17, 2015) ("the Second Circuit's findings of overwhelming evidence and harmless error necessarily dispose of the applicable Strickland prejudice inquiry."). Whether I apply Strickland de novo as to counsel's failure to preserve without regard to the Appellate Division's decision, or whether I review the Appellate Division's harmless error determination under either Chapman v. California, 386 U.S. 18 (1967), or Brecht v. Abrahamson, 507 U.S. 619, 637 (1993), the result comes out the same – as shown below, petitioner had far bigger problems if he chose to take the stand than being asked a couple of questions about whether on one occasion in the past he had possession of handguns.[8]

---

[8] I also reject respondent's argument that because petitioner did not testify, his ineffective assistance claim alleging his attorney's failure to object to the Sandoval ruling is not cognizable on federal habeas corpus review. The cases hold that petitioner's failure to testify precludes a challenge to the Sandoval ruling itself on due process grounds, see, e.g., Melendez v. LaValley, 942 F. Supp. 2d 419, 424 (S.D.N.Y. 2013), but it does not preclude a petitioner from arguing that his attorney was ineffective under the Sixth Amendment for failing to object to the Sandoval ruling. Nevertheless, petitioner's failure to testify makes it very hard for him to show prejudice from his counsel's

The record gives no indication of what testimony petitioner would have given had he testified except, as his attorney speculated to the Court of Appeals, maybe he would have testified that, "It was an accident, I just wanted to scare him" or that the shooting was in self-defense.  But petitioner had already testified to the grand jury that he was home when the shooting occurred, so testimony about his lack of intent to kill Brown-Gordon when he shot him would have made things worse.  His grand jury testimony and the overwhelming evidence against him made it entirely implausible for him to take the stand, and petitioner suffered no prejudice.

## V. Failure to interview witnesses

In his § 440.10 proceeding, petitioner argued that if his trial counsel had interviewed Perez, Brown-Gordon, and William (who testified to Brown-Gordon's excited utterance that petitioner shot him), these witnesses would have contradicted the statements and identifications that they gave to the police.  The § 440 court rejected this argument on the merits, holding that petitioner failed to produce any evidence suggesting that the witnesses would have recanted or contradicted themselves.

I would go further.  It is clear from the record that petitioner's counsel had more than one investigator assigned to his case.  There is no evidence why petitioner thinks counsel or one of counsel's investigators did not try to interview these three witnesses.  Frankly, since none of these witnesses had an obligation to talk to petitioner's team at all, and all three had already given statements indicating that petitioner had shot Brown-Gordon, I see no reason why any of them would have talked to a member of petitioner's legal team.  Whether I provide AEDPA

---

failure to object absent a convincing § 440 affidavit as to what he would have testified, which is lacking here.  See generally, Duren v. Lamanna, 18-cv-7218, 2020 WL 509179, at *22 (E.D.N.Y. Jan. 30, 2020) ("Petitioner did not testify, so any potential for prejudice is merely speculative and cannot be examined here.").

14

deference to the § 440 court's holding on the merits, or whether, for reasons stated in my prior decision, I review it *de novo* as part of the entirety of petitioner's ineffective assistance of counsel claim, it is wholly without merit.

## VI. Failure to seek suppression of cell-site information

Petitioner contends that his counsel was ineffective for not seeking suppression of cell-site information used at trial to tie him to the location of the crime. He contends that although a judge had issued a "trap and trace" warrant that led to his cell phone number, the police had no authority to use a cell site simulator to obtain his location.

Petitioner is wrong. I have reviewed the Order authorizing the search and it expressly includes the right to obtain cell site location information. The Order was supported by an affidavit showing more than sufficient probable cause for its issuance. There is no action petitioner's counsel could have taken to challenge this evidence.

## VII. Failure to highlight inconsistencies in testimony

Finally, petitioner contends that his counsel failed to effectively cross-examine William and Brown-Gordon at trial by showing inconsistencies between their testimony in the first trial and the second trial.[9]

There are few areas in which defense counsel's discretion is broader under <u>Strickland</u> than in determining which questions to ask and which to omit in cross-examination. As the Second Circuit has noted, "'whether to engage in cross-examination, and if so to what extent and in what manner, are ... strategic in nature' and generally will not support an ineffective assistance

---

[9] Petitioner submitted excerpts of the first trial to the § 440.10 court to show these inconsistences, and my conclusions above are based on those excerpts as compared to the transcript of the second trial.

15

claim." Dunham v. Travis, 313 F.3d 724, 732 (2d Cir. 2002) (quoting United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir. 1987)). See generally Cruz v. Griffin, No. 16-cv-8998, 2019 WL 6220806 (S.D.N.Y. Oct. 24, 2019) ("Petitioner cannot prevail on a claim of ineffective assistance merely because he believes that his counsel's strategy was inadequate or because the cross-examinations were arguably ineffective.") (*colatus*); Fabian v. United States, No. 04-cv-1896, 2007 WL 2480164, at *9 (E.D.N.Y. Aug. 28, 2007) ("Ineffective assistance of counsel claims based on inadequate cross-examination are strongly disfavored."). Courts within the Second Circuit afford "significant deference ... [to] a trial counsel's decision how to conduct cross examination," and "refus[e] to use perfect hindsight to criticize unsuccessful trial strategies." Eze v. Senkowski, 321 F.3d 110, 132 (2d Cir. 2003). Strickland's presumption of correctness "operates with particular force when the conduct at issue relates to counsel's conduct of cross-examination." Love v. McCray, 165 F. App'x 48, 49 (2d Cir. 2006). This is because trial counsel is not only required to consider materials available through pre-trial discovery, but to make rapid decisions based on the evidence that emerges during direct examination, and then to prioritize which points are worth raising and which are not.

Each of petitioner's claimed missed opportunities are merely attempts to second guess his counsel. Some have no basis in the record at all. A few of them are set forth here by way of example:

- William testified at the first trial that he didn't see what clothing the shooter was wearing, but at the second trial he testified that the shooter was wearing a hoodie.

16

There was no inconsistency.[10] William was not asked at the first trial whether he observed what petitioner was wearing.

- William's testimony at the second trial that the shooter wore a hoodie is inconsistent with what William told police.

For this assertion, petitioner relies on an uniform complaint prepared by the police and a DD-5 interview report. The complaint form states "OUTERWEAR – UNK", but, contrary to petitioner's assertion, does not describe the source of its information. The DD-5 was apparently prepared after a fleeting interview with William who was on his way to the hospital immediately following the shooting. The DD-5 states that William "did not see the [shooter's] face" (as William testified at trial) and that William "could not describe [the shooter's] clothing," after which William "then stated to the undersigned that he needed to go to the hospital to be with his son and would make himself available to answer any more questions at a later date."

These reports are statements of the officer purporting to relay what William had said, not statements of William himself, and thus could not have been used to impeach William. At most, defense counsel had a good faith basis for asking, "didn't you tell the police that you could not describe the shooter's clothing?" Perhaps William would have answered, "I don't remember;" perhaps he would have said, "yes, but I was on my way to the hospital and couldn't stop to talk to the officer;" or perhaps he would have said "no." Whichever answer he would have given does not allow the conclusion that petitioner was sufficiently prejudiced by the omission of the question that he was denied effective assistance. This was a trivial opportunity that does not come close to changing the outcome of the case in light of two witnesses testifying that petitioner

---

[10] In contending otherwise, petitioner cites only to Erick's grand jury testimony, not to any testimony given by William in the first trial. In any event, I have reviewed the excerpts of William's first trial testimony that petitioner submitted.

17

was the shooter, the victim's excited utterance to his father that petitioner shot him, and corroborating phone records.

- Brown-Gordon testified at the first trial that he had attended Transit Tech High School and did not graduate from it, but in the second trial, around seven months later, he testified that he had completed high school and some college.

It is true that Brown-Gordon testified at the second trial that he "last completed high school and some college." But petitioner's contention – that his counsel was constitutionally deficient for failing to address this apparent inconsistent – fails for many reasons. First, there is no evidence before me that, by the second trial, the victim had not completed his GED or had never taken any college level courses. Petitioner simply speculates that Brown-Gordon chose not to further his education in the months between trials. Second, assuming the victim embellished his educational background at the second trial, I cannot fault petitioner's trial counsel for choosing to forego challenging such an immaterial and collateral issue in the heat of a contentious attempted murder trial: just as petitioner is unsure of Brown-Gordon's educational achievements, his attorney could not have known at that precise moment whether the victim pursued his high school diploma through alternative means during those seven months between the two trials. It would have been a cardinal sin on cross-examination to ask a question to which one did not know the answer.[11]

Third, counsel's credibility (and thus petitioner's defense) would have likely been undermined if counsel chose to quibble with the victim on such a collateral issue, especially since the trial court most likely would not have permitted petitioner to introduce extrinsic evidence concerning this purely collateral matter. See People v. Duncan, 46 N.Y.2d 74, 412 N.Y.S.2d 833 (1978); People v. Metellus, 54 A.D.3d 601, 602, 864 N.Y.S.2d 408, 409 (1st Dep't

---

[11] See Irving Younger, The Irving Younger Collection: Wisdom & Wit from the Master of Trial Advocacy (2010).

2008) (trial court properly exercised its discretion in denying the defendant's request to introduce extrinsic evidence of an allegedly prior inconsistent statement since the subject matter of the alleged inconsistency had little or no probative value with regard to any issue other than general credibility).

Putting aside these three issues, the burden is on petitioner to show prejudice – that this "missed" opportunity would have made a difference. See Harrington, 562 U.S. at 104. But as noted above, the evidence against petitioner was overwhelming, consisting of multiple witnesses and the victim's declaration to his father, mere seconds after the shooting, that petitioner was his assailant. Therefore, counsel's strategic decision not to challenge the victim on such a trivial issue could not have prejudiced petitioner. See Sowell v. Anderson, 663 F.3d 783, 800-01 (6th Cir. 2011) (stating the petitioner had not been prejudiced in a capital murder trial by trial counsel's alleged ineffective assistance in not cross-examining witness to shooting since even if counsel would have highlighted these inconsistencies, they concerned somewhat collateral matters).

The remaining cross-examination omissions that petitioner alleges are either similarly without basis in the record or not nearly weighty enough to have deprived petitioner of effective assistance of counsel.[12] The fact is that his trial counsel not only engaged in cross, but re-cross examination, and in doing so, she did impeach William with several inconsistencies from prior proceedings. At the second trial, for example, petitioner's trial counsel, Ms. Leisenring, pointed

---

[12] Petitioner contends that another "critical inconsistency" counsel failed to highlight was that William purportedly brought blankets out to cover his son from the rain while they waited for the arrival of emergency personnel. This statement is contained in the DD-5 referenced earlier. He claims this prior statement would have shown that it rained the night of the shooting, thereby serving as circumstantial evidence that the witnesses's ability to perceive was impacted. Petitioner is mistaken. At the second trial, his counsel did in fact cross-examine William on this point, and William answered that "it was drizzling" – refuting his son's testimony that it wasn't raining. In light of William's testimony, there was no reason to introduce any weather reports.

out the following material inconsistencies: (1) at the first trial, the victim testified that his shooter was around "15 feet" away, but later testified at the second trial that he "never" said that; and (2) at the second trial, the victim testified that the shooter said, "Yo … [I'm] Trevor," even though he testified at the grand jury that "all [the shooter] said to me was 'yo'".

Petitioner's hindsight does not equate with constitutionally ineffective counsel.[13]

## CONCLUSION

The petition is denied and the case is dismissed. The Clerk is directed to enter judgment against petitioner. A certificate of appealability shall not issue as the petition raises no substantial constitutional issue. See 28 U.S.C. § 2253(c). Further, the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore *forma pauperis* status is denied for the purposes of any appeal. See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

**SO ORDERED.**

                                                                                U.S.D.J.

Dated: Brooklyn, New York
        August 26, 2020

---

[13] Petitioner calls his trial counsel ineffective for having characterized William's testimony as "credible" during summation. This was a strategic decision by his counsel to shift blame to another unknown suspect. William contradicted his son and Perez on many important issues (i.e., weather conditions, description of events leading up to the shooting, and Perez's behavior after the shooting). Since Brown-Gordon and Perez had positively identified petitioner as the shooter, William's testimony that there was no confrontation or conversation among the three before hearing gunfire undermined the prosecution's theory that the pair had ample opportunity to observe Brown-Gordon's shooter. As trial counsel vehemently argued, "[William's] perspective flies straight in the face of both Diana Perez and Erick Brown." In light of the overwhelming evidence pointing towards petitioner (and his decision to testify before the grand jury), a case of mistaken identity was a reasonable, if not the only, available defense.